IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiffs,<br><br>  vs.<br><br>NELSON NICOLAS NUNEZ-ACOSTA-ACOSTA, and FELIPE GENAO MINAYA,<br><br>            Defendants. | **4:18CR3058**<br><br>**FINDING, RECOMMENDATION AND ORDER** |

Defendants Nelson Nicolas Nunez-Acosta ("Nunez-Acosta") and Felipe Genao Minaya ("Minaya") move to suppress all evidence obtained during a vehicle search conducted on April 26, 2018, all evidence obtained as fruit of the alleged illegal vehicle search, and any statements made during or after the traffic stop. (Filing No. 46; Filing No. 50). For the reasons stated below, the motions should be denied.

STATEMENT OF FACTS

After hearing testimony and reviewing the documentary, audio, and video evidence, the undersigned magistrate judge finds as follows:

Trooper Samuel Mortensen ("Mortensen") is a Commercial Vehicle Safety Alliance ("CVSA") inspector with the Carrier Enforcement Division ("CED") of the Nebraska State Patrol. Mortensen's duties include ensuring compliance with state statutes and the Federal Motor Carrier Safety Administration's regulations pertaining to the operation of commercial motor vehicles.

On April 26, 2018, while patrolling Interstate 80 driving westbound in Buffalo County, Mortensen observed a semi-truck driving eastbound near mile marker 272. The truck had a refrigerated trailer with "U.S. Mail" markings on its side. Based on his training and experience, Mortensen knew the U.S. Mail did not use refrigerated truck trailers.

Mortensen turned his cruiser around to begin following the eastbound truck. The trooper observed the truck weaving within its traffic lane and drifting over the fog line onto the shoulder of the interstate multiple times. Mortensen activated his emergency lights around mile marker 277 to signal the truck to pull over. The truck did not stop immediately. Instead, it continued traveling eastbound for almost two miles. Around mile marker 279, Mortensen pulled alongside the truck and physically gestured the vehicle to pull over, at which point it did.

Mortensen contacted the semi-truck's two occupants. The trooper identified the driver as Minaya and the passenger as Nunez-Acosta. Nunez-Acosta's and Minaya's native language is Spanish. Mortensen does not speak Spanish. Although the language barrier posed some difficulty during the traffic stop, both defendants were able to provide responsive answers in English to Mortensen's questions.

Mortensen observed that the truck, which had New Jersey license plates, was equipped with a key-entry lock but no seal, and that it had only recently been issued a DOT number. The trooper requested Minaya's driver's license and vehicle documentation, and the required electronic logbook for that truck. Minaya produced the documentation and a paper logbook, stating that the electronic logbook was not working. He then produced an electronic logging device with security tape still covering the pins. Mortensen determined that the electronic

logging device had never been plugged into the vehicle's electronic control module, as required.

Mortensen asked Minaya to accompany the trooper to his patrol vehicle while he inspected the documentation and paper logbook. Upon reviewing the logbook entries, Mortensen noticed the truck was idle for ten days in Ontario, California. Minaya advised that he resided in Newark, New Jersey, and he was stopped in Ontario for diesel exhaust fluid repairs on the truck. Minaya stated that he and Nunez-Acosta had stayed in a hotel in Ontario, California during this time. Minaya further stated that they were towing an empty trailer with no cargo. At no point did Minaya mention being a U.S. Mail hauler.

While Minaya remained in the patrol vehicle, Mortensen returned to the truck and spoke with Nunez-Acosta. Nunez-Acosta told Mortensen that he owned but does not drive the truck, and he was escorting Minaya on this trip. In response to the officer's questions, Nunez-Acosta provided a very different account of the defendants' travel, stating he and Minaya had spent only one night at a hotel in Ontario, and they spent the remaining time in Las Vegas, Nevada. Nunez-Acosta made no reference to any alleged truck repairs, and never mentioned transporting U.S. Mail.

Mortensen returned to his patrol vehicle to perform a license and registration check and complete the Driver Inspection Report. Mortensen noted as violations in the report: failure to maintain a lane; drifting onto the shoulder; inattentive driving; no driver's record of duty status; and, failure to keep an electronic logbook. Mortensen noted that Minaya was shaking throughout the conversation and appeared nervous.

Mortensen told Minaya that his failure to keep an electronic logbook is a 10-hour out-of-service violation, meaning the truck would not be permitted to resume its travel back to New Jersey for at least 10 hours. Minaya did not appear bothered by this news.

Upon completing the inspection report and citation, Mortensen told Minaya that he was free to leave. Mortensen than asked Minaya if Mortensen could search the vehicle. Minaya agreed. Mortensen sought verbal confirmation of Minaya's consent, and Minaya again stated that, "yeah," Mortensen could search the truck.

Mortensen advised Minaya to wait in the patrol car while he sought consent to search from Nunez-Acosta. Mortensen contacted Nunez-Acosta in the truck and informed him that Minaya had consented to a search of the truck. Nunez-Acosta appeared confused when Mortensen initially requested permission to search the truck. However, upon Mortensen's repeated request to search, Nunez-Acosta offered to unlock the trailer for Mortensen's inspection. After unlocking and opening the trailer door, Nunez-Acosta stood outside near the rear of the truck while it was searched.

Inside the trailer, Mortensen saw metal shavings on the floor consistent with work being done to the front of the trailer. In searching the cab, Mortensen observed several tools, including power drills, sockets, wrenches, drill bits, and several bolts. The bolts Mortensen found in the truck's cabin matched those around the refrigeration unit inside the trailer. Mortensen returned to the trailer, retrieving the tools.

Directly beneath the refrigeration unit, Mortensen identified a plastic cover secured by bolts. Mortensen noticed several bolts were missing, some of the bolts

did not match, only four of the bolts were securely tightened, and there was fresh calking and sealant around the sides of the trailer.

Upon pulling back the plastic paneling, Mortensen observed a second piece of plastic sheeting. After pulling back the second piece of plastic sheeting, Mortensen identified a hidden compartment with several brick-shaped packages that appeared to be drugs. Nunez-Acosta and Minaya were then arrested and transported, in custody, to the Nebraska State Patrol ("NSP") office in Kearney, Nebraska. There, Minaya agreed to be interviewed without counsel present. He was later advised of his <u>Miranda</u> rights with interpreting assistance provided by a DEA task force agent, who was raised in a Spanish-speaking home. Minaya waived his <u>Miranda</u> rights.

Officers ultimately removed 42 packages, with a combined total weight of 118.2 pounds, of what was later identified as containing N-phenyl-N-[ 1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly known as " fentanyl," a Schedule II controlled substance.

On June 20, 2018, an Indictment was filed, charging Defendants with knowingly and intentionally possessing with intent to distribute 400 grams or more of a mixture or substance containing fentanyl in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1). (Filing No. 28).

## ANALYSIS

The defendants argue that the search of the truck violated their Fourth Amendment right to be free from unreasonable searches and seizures, and therefore all evidence seized as a result, including any statements made, must be suppressed as fruit of the poisonous tree. (Filing No. 46; Filing No. 50). Minaya

further argues his Fifth Amendment privilege against self-incrimination and his Miranda rights were violated, and all statements should be suppressed. ([Filing No. 50](#)). In turn, the United States asserts that because the vehicle stop was proper and the ensuing search consensual, exclusion of evidence is unwarranted. ([Filing No. 55](#)). The United States further argues that Minaya's Fifth Amendment privilege against self-incrimination was not violated because he was never subjected to interrogation by Mortensen, and he provided a knowing, intelligent, and voluntary waiver of his Miranda rights before being interrogated by DEA Agent Bauer. ([Filing No. 55](#)).

I.    Officer Contact, Detention, and Search.

A.  Nature of Contact.

The defendants first argue Mortensen initiated the traffic stop without reasonable and articulable suspicion of a traffic violation. "It is well established that any traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver." [United States v. Washington, 455 F.3d 824, 826 (8th Cir. 2006)](#). "To determine whether a traffic stop was based on probable cause or was merely pretextual, an 'objective reasonableness' standard is applied." [United States v. Mallari, 334 F.3d 765, 766 (8th Cir. 2003)](#). That is, "[a]n officer is justified in stopping a motorist when the officer 'objectively has a reasonable basis for believing that the driver has breached a traffic law.'" [Id. at 766-67](#) (quoting [United States v. Thomas, 93 F.3d 479, 485 (8th Cir. 1996)](#)).

Here, Mortensen observed the truck (1) weave within its traffic lane; (2) cross the fog line and drive on the interstate's shoulder numerous times; and (3) fail to yield to Mortensen for two miles after he activated his emergency lights, while making additional lane changes. Nebraska courts have held that "a vehicle

weaving in its own lane of traffic provides an articulable basis or reasonable suspicion for stopping a vehicle." State v. Thomte, 226 Neb. 659, 663 (1987). Further, under Neb. Rev. Stat. § 60-6.142, vehicles are not allowed to drive on the shoulders of highways, unless an enumerated exception applies (none of which are applicable to the instant matter. "Where a portion of a vehicle is driven on a shoulder for only a brief period over a short distance, the driver of the vehicle has violated § 60-6.142." State v. Medina, case no A-11-377, 2011 WL 2577268, *5 (Neb. App. June 28, 2011).

Based on the credible testimony of Mortensen and video evidence, Mortensen had an objectively reasonable basis to believe a traffic law was violated. The initial traffic stop did not violate Defendant's Fourth Amendment rights.

B. Duration of Contact.

Defendants further argue Mortensen extended the traffic stop longer than was necessary to issue the citation and therefore the stop was an impermissibly long detention for the purposes of the Fourth Amendment. "A constitutionally permissible traffic stop can become unlawful 'if it is prolonged beyond the time reasonably required to complete' its purpose." United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 2008) (quoting Illinois v. Caballes, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005)). During a traffic stop an officer may complete routine tasks such as requesting the driver's license and the vehicle's registration, reviewing criminal history, and asking questions about the occupants' destination, route, and purpose. See United States v. Riley, 684 F.3d 758, 764 (8th Cir. 2012)(internal citations omitted). "Whether a particular detention is reasonable in length is a fact-intensive question, and there is no per se time limit on all traffic stops. When there are complications in carrying out the traffic-related purposes of the stop, for example, police may reasonably detain a driver for a longer duration

than when a stop is strictly routine." United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007).

A traffic stop may be extended when the investigating officer, based on the totality of the circumstances, has reasonable suspicion to believe criminal activity unrelated to the stop may be occurring, or evidence of such activity may be present.

> If an officer develops reasonable suspicion regarding unrelated criminal conduct during the course of a lawful traffic stop, "an officer may broaden his inquiry and satisfy those suspicions" without running afoul of the Fourth Amendment. United States v. Jones, 269 F.3d 919, 926-27 (8th Cir.2001) (quotation omitted). Reasonable suspicion requires "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." United States v. Donnelly, 475 F.3d 946, 952 (8th Cir.2007) (quotation omitted); see also Terry v. Ohio, 392 U.S. 1, 20-21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances, in light of the officer's experience." United States v. Linkous, 285 F.3d 716, 720 (8th Cir.2002) (quotation omitted).

United States v. Gill, 513 F.3d 836, 844 (8th Cir. 2008).

Reasonable suspicion may evolve or increase during the course of the traffic stop "as the circumstances unfold and more suspicious facts are uncovered." Linkous, 285 F.3d at 720. In determining whether reasonable suspicion exists, officers "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Chartier, 772 F.3d 539, 543-44 (8th Cir. 2014) (quoting United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (internal citations omitted)).

Based on the totality of the circumstances, the court finds that Mortensen had reasonable suspicion to extend the stop to further investigate the defendants. Based on his knowledge and expertise, Mortensen, who inspects between 700-800 commercial trucks per year, explained several unusual and suspicious observations he made that were inconsistent with commercial trucking, including:

- The truck had "U.S. Mail" decals, a refrigerated trailer, and neither Defendant alleged to be a carrier of U.S. Mail;
- U.S. Mail trucks do not pull refrigeration trailers;
- The truck failed for two miles to pull over when Mortensen activated his emergency lights.
- The defendants provided different stories regarding what they had done and where they had stayed during the 10 days the truck was idle.
- The defendants were able to provide only a paper log book.
- The trailer door was unsealed but had a padlock.
- The refrigerated trailer was empty, indicating the defendants were incurring fuel expenses for no profit.
- Although Minaya stated the electronic logging device was not working, the device was in its original packaging with the security tape across the pins still intact, indicating it had never been plugged in.
- Throughout Mortensen's interaction with Minaya, he appeared notably nervous and was shaking.
- Neither Defendant was able to explain what they were hauling.
- The stated length of time the truck was idle for completing diesel exhaust fluid repairs (10 days) was substantially beyond industry standards.
- Neither Defendant appeared disappointed when the Mortensen announced the truck would be out-of-service for 10 hours.

These factors clearly gave Mortensen reasonable suspicion to expand the length of the stop. United States v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004) (holding conflicting stories provided by vehicle occupants may justify expanding a vehicle stop and detaining the occupants to investigate possible criminal activity).

C. Consent to search.

Once Mortensen concluded the traffic stop, he informed Minaya that he was free to leave, and then asked for consent to search the truck before the defendants left. Minaya voluntarily agreed, as did Nunez-Acosta. Then Nunez-Acosta appears to willingly exit the truck and unlock the trailer, further indicating consent to search by his actions.[1]

Police may search an area, regardless of the presence of probable cause or reasonable suspicion, if voluntary consent is provided by Defendant. U.S. v. Chaidez, 906 F.2d 377, 381 (1990). The Eighth Circuit has consistently held that "a voluntary consent need not amount to a waiver; consent can be voluntary without being an intentional relinquishment or abandonment of a known right or privilege." Id. (internal quotation omitted). Rather, "the proper test is whether the totality of the circumstances demonstrates that the consent was voluntary." Id. (internal citations omitted). In other words, whether, under the circumstances, the

_____

[1] The court further notes that commercial trucks are subject to inspection by carrier enforcement officers. Neb.Rev.St. § 75-115. The Eighth Circuit has repeatedly held that the commercial trucking industry is a "closely-regulated industry." See United States v. Ruiz, 569 F.3d 355, 356-57 (8th Cir. 2009); United States v. Mendoza–Gonzalez, 363 F.3d 788, 794 (8th Cir. 2004); United States v. Knight, 306 F.3d 534, 535 (8th Cir. 2002); United States v. Parker, 587 F.3d 871, 878 (8th Cir. 2009). "Trucks operate twenty-four hours a day and the officers must, necessarily, have the authority to conduct these administrative inspections at any time." Ruiz, 569 F.3d at 357.

consent was "the product of an essentially free and unconstrained choice by its maker, rather than "the product of duress or coercion, express or implied." Id. (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973).

"[C]onsent 'can be inferred from words, gestures, or other conduct.'" United States v. Rogers, 661 F.3d 991, 994 (8th Cir. 2011) (quoting Pena-Ponce, 588 F.3d at 584). The government carries the burden of proving the voluntariness of consent by a preponderance of the evidence. United States v. Galvan-Muro, 141 F.3d 904, 907 (8th Cir. 1998). When assessing the voluntariness of a consent, suspect characteristics which may be relevant include:

> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their Miranda rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

United States v. Griffith, 533 F.3d 979, 984 (8th Cir. 2008).

Relevant characteristics of the environment in which consent was given include:

> [W]hether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or secluded place; or (6) either objected to the search or stood by silently while the search occurred.

Griffith, 533 F.3d at 984. These factors are not to be applied mechanically, but serve as a guide. The question is "not whether [a defendant] subjectively consented, but rather, whether a reasonable officer would believe consent was given." U.S. v. Correa, 641 F.3d 961, 967 (2011).

Defendants argue that a language barrier vitiated the voluntariness of their consent. (Filing No. 47, at CM/ECF p. 8; Filing No. 51, at CM/ECF pp. 16–18). Having thoroughly reviewed the video, audio, and documentary evidence, as well as Mortensen's testimony, the court rejects this argument. While Mortensen, at times, had to repeat or rephrase his inquiries, the defendants provided appropriate responses on a comprehensive range of topics throughout the traffic stop, indicating they were able to communicate in English. Both defendants provided verbal consent and affirmation that they understood the nature and scope of what they were consenting to. Neither defendant appeared to be under the influence of drugs or alcohol. Nor was either Defendant handcuffed or restrained at the time consent was requested. The traffic stop occurred in a public place amidst traffic. Mortensen maintained a relaxed, friendly, and professional tone throughout the stop, and he made no promises or threats to secure the defendants' consent. See United States v. Perez, 200 F.3d 576, 579-80 (8th Cir 2000) (holding that even though English was not the defendant's primary language and the request for consent was in English, the defendant's consent was voluntary where he was an adult who was not incapacitated, was able to communicate appropriately in English, and was not threatened or coerced).

Before Mortensen asked Minaya for his permission to search the semi-truck, Nunez-Acosta had offered to unlock the trailer for the trooper to inspect it. After gaining Nunez-Acosta's consent a second time, video footage shows Nunez-Acosta voluntarily walking back to the trailer, unlocking it for Mortensen, and swinging open the back-trailer door. Thus, Nunez-Acosta consented both verbally and nonverbally.

A reasonable officer in Mortensen's position would have believed that both Minaya and Nunez-Acosta voluntarily consented to a search of the truck and trailer.

D. Scope of Consent.

The defendants argue that even if consent was obtained, Mortensen's search exceeded the scope of that consent; specifically, that Mortensen's use of the tools he found inside the truck to later damage plastic and metal panels in the trailer exceeded the scope of Defendants' consent. ([Filing No. 47, at CM/ECF p. 10](#); [Filing No. 51, at CM/ECF p. 24](#)). Defendants further argue that from where they were being held, they were unable to see the inside of the trailer where the troopers were searching,[2] and a reasonable person would not have believed he could move toward the trailer, enter it, and revoke consent. ([Filing No. 47, at CM/ECCF p. 10](#); [Filing No. 51, at CM/ECF p. 24](#)). Defendants argue, in turn, that because neither was able to watch the ongoing search, they were not effectively present to object to it. ([Id](#).)

"The standard for measuring the scope of a [person's] consent under the Fourth Amendment is that of 'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?" [United States v. McMullin, 576 F.3d 810, 815 (8th Cir. 2009)](#) (quoting [Jimeno, 500 U.S. at 251](#)). "The scope of a search is generally defined by its expressed object." [Jimeno, 500 U.S. at 251](#) (citing [United States v. Ross, 456 U.S. 798 (1982)](#). In assessing the scope of a person's consent, the court must examine the totality of the circumstances, including the language of a suspect's consent and his actions during the officers' search. See [United States v. Starr, 533 F.3d 985, 996 (8th Cir. 2008)](#). Specifically, the court may consider a suspect's failure to

---

[2] Nunez-Acosta argues he "was required to stand on the side of the road, [and] from his standpoint, he was not able to see inside of the trailer where the troopers were searching. Minaya was sitting in Mortensen's patrol car, unable to see what was happening inside of the semi-truck or trailer." ([Filing No. 51, at CM/ECF p. 24](#)).

object when a search allegedly exceeds what is claimed to be the limits of the consent. This failure to object may be an indication that the search was within the scope of consent. See United States v. Lopez-Mendoza, 601 F.3d 861, (8th Cir. 2010).

Both Minaya and Nunez-Acosta provided verbal consent for Mortensen to search the truck. As the truck's owner, Nunez-Acosta provided additional nonverbal consent by voluntarily unlocking and opening the truck's trailer. Further, both defendants admit that at no point did either attempt to revoke consent. Nor did either Defendant object as the search progressed.

The court is not convinced that Defendants were unable to object to the search or revoke their consent. Minaya was seated in the front seat of Mortensen's cruiser. Although additional troopers had arrived, Minaya was neither in custody nor physically restrained from exiting the front seat and announcing his objection to the officer's continued search. And there is no evidence Nunez-Acosta, standing at the trailer's rear, could not have done the same.

Mortensen did not exceed the scope of the search by using the tools he recovered in the truck's bed to pry up the plastic and/or metal panels. Moreover, "a warrantless search of an automobile, predicated on consent, may be expanded beyond the scope of consent when it yields a basis for a reasonable articulable suspicion that additional contraband may be found in parts of the [vehicle] not included in the consent." United States v. Casares-Cardenas, 14 F.3d 1283, 1286 (8th Cir. 1993) (citing United States v. Chaidez, 906 F.2d 377, 383-84 (8th Cir. 1990)). In Chaidez, the officer completing a vehicle search noticed a plastic back seat covering was torn, missing or loose screws along the side panels and rear seat, and the rear seat cushion in an abnormal position. Based on these suspicious

observations, the Eighth Circuit upheld the district court's finding of reasonable grounds for the expanded search.

Similarly, here, Mortensen initially observed the presence of tools in the cab, and recent modifications to the front of the trailer, with loose, missing, and mismatched bolts, and fresh caulking and sealant around the trailer's base. These observations alone, and clearly in the context of the previously enumerated observations and statements which prompted the officer to lengthen the detention and request consent to search, provided ample and reasonable grounds for Mortensen to expand his search and remove paneling and plastic to see what, if anything, Defendants were hiding.

In light of Defendants' initial consent, their actions throughout the search, and Mortensen's observations prior to and during the search, the court finds Mortensen's search of the truck trailer did not violate the Defendants' Fourth Amendment rights. The evidence found during the search of the truck should not be suppressed.

II.    Statements.

A. Traffic Stop.

Minaya also seeks to suppress statements made after the vehicle was searched. To the extent Defendants challenge the statements made as fruit of an alleged illegal stop, detention or vehicle search, for the reasons discussed above, Defendant's motion should be denied.

Minaya next argues that questioning during the traffic stop violated Minaya's rights under Miranda v. Arizona, 384 U.S. 436 (1966). (Filing No. 51, at CM/ECF

p. 25–26). Miranda warnings are required when an individual has been subjected to "custodial interrogation." Miranda v. Arizona, 384 U.S. 436, 444-45 (1966). The warnings are necessary "to dispel the compulsion inherent in custodial surroundings." Id. at 444. Most routine traffic stops do not trigger the need for Miranda warnings, and an individual temporarily detained pursuant to an investigatory traffic stop is not in custody for purposes of Miranda. Berkemer v. McCarty, 468 U.S. 420, 440 (1984). A detained motorist is entitled to the protections prescribed by Miranda only if the treatment he is subjected to during the stop renders him "in custody" for practical purposes. Id. at 440; see also United States v. Martinez, 462 F.3d 903, 909-10 (8th Cir. 2006).

During the stop, Mortensen questioned the defendants in furtherance of his duties as a CVSA inspection officer. He never handcuffed the defendants, and neither Mortensen nor any other officer who arrived at the scene exhibited any coercive or threatening tone or actions. Throughout the encounter, Minaya appeared to understand the questions and to cooperate by willingly responding. Neither defendant was in custody prior to being handcuffed, and there is no evidence their responses to questioning were coerced. Their statements at the scene of the traffic stop should not be suppressed under Miranda, or as involuntary.

B.  Custodial Interrogation

Minaya next argues that statements made during the custodial interrogation at the NSP office must be suppressed because Minaya was not adequately and properly advised of his Miranda rights. Minaya seeks to suppress: (1) his statements made in custody prior to being read his Miranda rights; and (2) statements he made after being Mirandized in Spanish, which he contends were not freely, knowingly, or voluntarily made.

Interrogation occurs when a defendant is in custody and is subjected to law enforcement questioning which is "reasonably likely to elicit an incriminating response from the suspect." U.S. v. Hernandez-Mendoza, 600 F.3d 971, 977 (8th Cir. 2010); United States v. Jackson, 852 F.3d 764 (8th Cir. 2017). Minaya was in custody when questioned at the state patrol office, but DEA Agent Bauer's initial questioning prior to advising Minaya of his Miranda rights was not interrogation. Rather, Agent Bauer posed basic biographical questions about Minaya's identity (name, age, address, etc.). "[A] request for routine information necessary for basic identification purposes is not interrogation under Miranda, even if the information turns out to be incriminating. Only if the government agent should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged, will the questioning be subject to scrutiny." United States v. McLaughlin, 777 F.2d 388, 391-92 (8th Cir. 1985). As to the drug offenses at issue, Bauer's biographical questions posed to Minaya were not likely to elicit an incriminating response. Bauer did not violate Miranda by asking these questions.

After the biographical questioning was complete, Minaya was advised of his Miranda rights in Spanish by a DEA task force officer. The advisement and later interrogation was performed telephonically.

Statements made in response to custodial interrogation are admissible if the defendant voluntarily, knowingly and intelligently waived his privilege against self-incrimination following an advisement of rights. Miranda v. Arizona, 384 U.S. 436, 479 (1966). The test for voluntariness is whether, "in light of the totality of circumstances, pressures exerted upon the suspect have overborn his will." United

States v. Jorgensen, 871 F.2d 725, 729 (1989)(quoting Haynes v. Washington, 373 U.S. 503, 513–14 (1963)). Factors the court should examine include the details of the interrogation including tactics used by the officer, and characteristics of the defendant. United States v. Wilson, 787 F.2d 375, 381 (8th Cir. 1986).

Minaya argues that language difficulties barred his knowing waiver of Miranda rights. The court is unconvinced. The DEA officer was raised by Spanish-speaking parents and was fluent in Spanish. The interpreter advised the questioning officer that Minaya had waived his Miranda rights and agreed to be questioned without counsel.

Minaya's counsel argues the consent was not sufficient because the law enforcement interpreter may have spoken a different dialect of Spanish, was not certified, and did not interpret word for word as required for court proceedings. The court rejects this argument. The standards applied to interpreters assisting law enforcement in day-to-day encounters, 24 hours a day, 365 days a year, must by necessity be different than the standards imposed on court interpreters.

Here, the law enforcement interpreter was fluent in Spanish, having been raised by Spanish-speaking parents. He appropriately responded to Defendant's questions regarding his right to counsel, advising Defendant that the appointed attorney would be free, but if he invoked his right to counsel, any questioning would be delayed until an attorney was appointed. After receiving this explanation, the officer again asked Minaya, "Are you willing to answer questions right now, without, without the presence of an attorney?" Defendant responded "yes for, yes, right now yes." Ex. 104.  Under the circumstances presented, the court finds Minaya waived his right to counsel before questioning by law enforcement.

With the interpreter's help, Minaya willingly answered each of Bauer's questions knowingly, intelligently, and voluntarily. There is no evidence his responses were a result of police coercion or threats of force. Minaya's statements to Bauer should not be suppressed.

The court finds that Minaya was properly advised of his <u>Miranda</u> rights, he knowingly, intelligently, and voluntarily waived these rights, and his responses to law enforcement questioning were voluntary.

## CONCLUSION

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable John M. Gerrard, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b), that the motions to suppress filed by the defendants (Filing Nos. 46 & 50) be denied in their entirety.

The defendants are notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

IT IS ORDERED that the jury trial of this case is set to commence before John M. Gerrard, Chief United States District Judge, in Courtroom 1, United States Courthouse, Lincoln, Nebraska, at 9:00 a.m. on March 11, 2019 or as soon thereafter as the case may be called, for a duration of four (4) trial days. Jury selection will be held at the commencement of trial.

Dated this 8th day of February, 2019.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge